IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:10-CV-319 (MTT) |
| | ) | |
| $19,054.00 IN UNITED STATES FUNDS, | ) | |
| | ) | |
| Defendant Property, | ) | |
| | ) | |
| YOELKYS MARTINEZ-DIAZ, | ) | |
| | ) | |
| Claimant. | ) | |

## ORDER

Plaintiff United States of America filed this forfeiture action against $19,054.00 in United States funds pursuant to 21 U.S.C. § 881(a)(6). Yoelkys Martinez-Diaz filed a timely claim to the property. The Court denied the United States' motion for summary judgment, and on July 31, 2013 the Court held a non-jury trial. At the Claimant's request, the Court left the record open to allow the Claimant to submit a letter he received from the Department of Justice. That letter has now been filed. (Doc. 46). The Court finds in favor of the United States based on the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

After considering the evidence presented at trial, the Court finds that the following facts have been proven by a preponderance of the evidence:

1. On February 16, 2010, at approximately 7:00 p.m., Sergeant Gary Long, of the Lamar County Sheriff's Office, and Lieutenant Cory Bone, of the Greensboro

       Police Department, observed a vehicle traveling in excess of 100 miles per hour on Interstate 75.

2. Sergeant Long turned on his vehicle's blue lights and began pursuing the speeding vehicle.

3. At mile marker 198, the vehicle quickly moved, without use of a blinker, from the left lane to the right lane and then left the interstate at exit 198 to High Falls Park Road.

4. The vehicle crossed over High Falls Park Road and returned to Interstate 75.

5. The vehicle eventually moved into the emergency lane and stopped around mile marker 196.

6. Sergeant Long and Lieutenant Bone pursued the vehicle for approximately three miles and at speeds up to 145 miles per hour.

7. Sergeant Long approached the driver's side of the vehicle with his gun drawn and grabbed the driver, Claimant Yoelkys Martinez-Diaz, by the wrist and pulled him from the vehicle.

8. Sergeant Long took Martinez-Diaz to an area behind the car and placed him face down on the ground and handcuffed him.

9. There were three passengers in the vehicle. Sergeant Long, along with other law enforcement officers, handcuffed the two men who were in the vehicle, and secured a female passenger on the side of the road.

10. Sergeant Long placed Martinez-Diaz under arrest for fleeing and attempting to allude and reckless driving.

11. Sergeant Long then conducted an inventory search of the vehicle and found eight rubber banded bundles of United States currency in the vehicle's glove box, eight rubber banded bundles of United States currency in a purse on the passenger side floor board, and eleven rubber banded bundles of United States currency in a green tote bag in the rear part of the vehicle.

12. The currency was bundled in "stacks" of bills, in $1,000.00 increments.

13. When Sergeant Long asked Martinez-Diaz about the large amount of currency, Martinez-Diaz said it was his money and that he had borrowed $5,000.00 and saved the remaining amount from his job with a south Florida trucking company, Gonzales Trucking.  Martinez-Diaz was unable to provide the name of the individual from whom he borrowed the $5,000.00.  Martinez-Diaz also told Sergeant Long that he and his passengers were traveling home to Miami from Atlanta.

14. On the roadside, Sergeant Long used a drug dog, Paco, trained to detect the odor of certain controlled substances, to conduct a "free air sweep" of the vehicle and to conduct a sweep of the green tote bag and purse.  Paco gave a positive alert to the odor of illegal narcotics on the passenger side of the vehicle and on both bags containing currency.

15. Eight additional rubber banded bundles of currency were found in one of the passenger's shirt or jacket sleeve when the individuals were transported to the police station.

16. No narcotics were found in the vehicle, and neither Martinez-Diaz nor any of the passengers had prior arrests or convictions for drug-related crimes.

17. $33,354.00 in United States currency was seized.

18. Martinez-Diaz makes a claim to $19,054.00 of the seized property.[1]

19. Martinez-Diaz gave the following testimony. Two individuals, Acosta and Blanco, each loaned him, interest-free, $10,000.00. Martinez-Diaz, Acosta, and Blanco grew up together in Cuba.[2] Acosta worked as a manager of a Cuban café, and Blanco worked as a registered nurse. Neither Acosta nor Blanco testified to corroborate Martinez-Diaz's story.[3] Martinez-Diaz said he had saved from his wages the remaining money, approximately $13,000.00. During 2009, Martinez-Diaz said that he made approximately $25,000.00 to $26,000.00 as a truck driver but that he did not file an income tax return for that year. During 2009 he also bought a vehicle for approximately $12,000.00 in cash. Martinez-Diaz and his passengers left Miami the previous night and drove to Atlanta. He said they went to Atlanta to purchase a truck he had seen advertised. Once in Atlanta, he said he bought the truck for $29,000.00, in cash, but after driving the truck he realized the truck had transmission problems. He testified that the owner of the dealership refused to return his money but, instead, said he would fix the truck and told Martinez-Diaz to come back later that afternoon. Martinez-Diaz believes

---

[1] At trial, and in previous filings with the Court, Martinez-Diaz insisted that he intended to claim the entire amount seized. However, it is clear that Martinez-Diaz's verified claim filed with the Court "makes a claim and request for $19,054.00 in U.S currency." (Doc. 5 at 1).

[2] Martinez-Diaz, who is now 33 years old, is Cuban, and in February 2010, had been an illegal alien resident of the United States for three years. (Claimant Ex. 2; Doc. 45-2). He testified that Acosta and Blanco were two or three years older and had immigrated to the United States two or three years before he had.

[3] Martinez-Diaz stated that had he known he needed witnesses, Acosta and Blanco (and the passengers) would have testified on his behalf. At the pre-trial conference, the Court made clear that Martinez-Diaz would need witnesses at trial and would not be able to rely on the "affidavits" that were considered in the Court's denial of the United States' motion for summary judgment. *See* (Doc. 42) ("The Court advised Mr. Martinez that witnesses have to testify; that affidavits are not generally admissible evidence. If Mr. Martinez wants to rely on statements of others, they will need to testify.")

he gave the owner of the dealership the money still in bundles, and he was not sure whether the owner took off the rubber bands and counted the money.  They then went to another truck dealer in Cumming, Georgia, Bulldog Repo.  When he returned to the initial dealership, he was told the truck could not be repaired and the owner of the dealership returned his money.  Martinez-Diaz said they also went to a third dealer in another unsuccessful attempt to purchase a truck.  After that, Martinez-Diaz and his passengers decided to return to Miami.  He said that he was nervous when he saw the police attempting to pull him over, and he admitted he initially fled from the police.  He did so, he said, because he thought it was illegal to carry more than $10,000.00 in cash.  When asked why the money was split among the passengers and in the glove compartment, Martinez-Diaz testified that the passengers were recounting the money, but he was unsure how money ended up in the glove box.  None of the passengers testified to corroborate Martinez-Diaz's story.  No one from any of the truck dealerships corroborated Martinez-Diaz's story.

20. On cross-examination, the Government impeached Martinez-Diaz's credibility by questioning him about a criminal conviction.  Martinez-Diaz admitted that he plead guilty to one count of possession with intent to distribute 1,349 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), in the Southern District of Texas, Criminal Case Number, 2:10-cr-224.[4]

---

[4] Martinez-Diaz's criminal conviction was used by the United States to attack Martinez-Diaz's credibility pursuant to Federal Rule of Evidence 609(a).  To be clear, the Court considers Martinez-Diaz's criminal conviction for its impact on Martinez-Diaz's "character for truthfulness."  Fed. R. Ev. 609(a).  The Court does not consider Martinez-Diaz's criminal conviction as Rule 404(b) evidence.  *See United States v. $21,175.00*, ___ F. App'x ___, 2013 WL 2450740, at * 6, n. 5 (11th Cir.) (evidence of prior criminal conviction introduced for Rule 404(b) purposes could be problematic in civil forfeiture cases when intent is not at issue).

21. The Court finds Martinez-Diaz's explanations of how he got the money and what he was going to use the money for implausible and inconsistent. Thus, the Court concludes that Martinez-Diaz provided insufficient evidence that the money was derived from a legitimate source or was to be used for a legitimate purchase.

## CONCLUSIONS OF LAW

1. The United States "must establish by a preponderance of the evidence that the property is subject to forfeiture." *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (citing 18 U.S.C. § 983(c)(1)). Specifically, in forfeiture actions brought pursuant to 21 U.S.C. § 881(a)(6), the United States "need only show that the money was 'related to some illegal drug transaction.'" *Id.* To determine whether the United States has met its burden, the Court looks to the "totality of the circumstances." *Id.*

2. After the United States meets its burden of proof, the claimant may seek to establish by a preponderance of the evidence that the Defendant Property was not used in or related to a violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

3. The totality of the facts in this case demonstrates a substantial connection and relation between the Defendant Property and illegal drug activity. The factors leading to this conclusion are: (1) Martinez-Diaz's initial flight from authorities; (2) Martinez-Diaz's conflicting statements regarding the source of the funds; (3) the implausibility of both statements, i.e., that Martinez-Diaz, with his $25,000.00 a year job and his recent purchase of a $12,000.00 car with cash, and his friends could raise $33,354.00 in cash; (4) similarly, Martinez-Diaz's inability to provide

evidence of a legitimate source for the currency; (5) the amount of currency Martinez-Diaz was transporting and the manner in which it was bundled and hidden in four different areas: the glove compartment, a passenger's purse, another passenger's shirt or jacket sleeve, and the green tote bag; (6) the odor of narcotics detected by a drug dog, Paco, on both bags carrying the currency and the vehicle; and (7) Martinez-Diaz's inability to provide a plausible explanation for transporting the currency from Atlanta to Miami.

4. Pursuant to 21 U.S.C. § 881(a)(6), the Defendant Property, described as follows, is hereby forfeited to and vested in Plaintiff United States of America to be disposed of in accordance with the law: $19,054.00 in United States currency.

## CONCLUSION

At trial, the United States proved that the Defendant Property is United States currency that constitutes proceeds traceable to an exchange for a controlled substance in violation of the Controlled Substance Act. Accordingly, the Defendant Property is forfeitable pursuant to 21 U.S.C. § 881 (a)(6) and is hereby forfeited to the United States.

**SO ORDERED**, this 30th day of September, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT